[Criminal No. 576.  Filed December 22, 1923.]

[221 Pac. 228.]

FRANK GARDENHIRE, Appellant, v. STATE, Respondent.

1. FOOD — ORDINANCE DENOUNCING ADULTERATION OF MILK HELD VALID.—Ordinance denouncing adulteration of milk adopted by a town incorporated under Civil Code of 1901, paragraphs 536–

---

1. Constitutionality of regulations as to milk, see notes in 4 **Ann. Cas.** 119; 5 **Ann. Cas.** 911; 18 **Ann. Cas.** 321; Ann. Cas. 1915C, 72; 18 **A. L. R.** 235.

On validity of regulations regarding the adulteration of milk, see notes in 1 **L. R. A.** (N. S.) 928; L. R. A. 1917C, 248.

See 26 **C. J.** 756; 28 **Cyc.** 693, 705, 734.

612, and continued in force by freeholders' charter, adopted by the town under Constitution, article 13, section 2, and Civil Code of 1913, paragraphs 2033–2037, *held* valid under Revised Statutes of 1901, paragraph 545, subsection . 28, which authorized such town prior to adoption of freeholders' .charter to prescribe regulations "necessary and expedient for the prevention or suppression of disease," in view of subsections 26 and 27, and under provisions of the freeholders' charter authorizing the city to provide for and regulate the inspection of milk and other food products offered for sale.

2. MUNICIPAL CORPORATIONS—FREEHOLD CHARTER EMPOWERS CITY TO ENACT ALL ORDINANCES CONSISTENT WITH CONSTITUTION AND STATUTES.—A freehold charter adopted under Constitution, article 13, section 2, and Civil Code of 1913, paragraphs 2033–2037, empowers the city to enact any and all rules, regulations and ordinances consistent with and subject to the Constitution and laws of the state, and may provide for the exercise of powers by the city not delegated to it by the legislature.

APPEAL from a judgment of the Superior Court of the County of Yuma. Fred L. Ingraham, Judge. Affirmed.

Messrs. Timmons & Westover, for Appellant.

Mr. John W. Murphy, Attorney General, Mr. A. R. Lynch, Mr. Earl Anderson and Mr. E. W. McFarland, Assistant Attorneys General, and Mr. H. H. Baker, County Attorney, for the State.

ROSS, J.—The appellant appeals from a conviction of violating section 9 of Ordinance No. 70 of the town (now city) of Yuma, entitled:

"An ordinance regulating the sale of milk, cream, condensed or evaporated milk or cream in the town of Yuma, and providing for the inspection of milk, cream, condensed or evaporated milk or cream, dairies, cows, cow-stables, milk-houses, milk vessels and vehicles."

The ordinance consists of nineteen sections, and has for its object the securing for the inhabitants of the corporation of a clean, pure and wholesome quality of milk and milk products. The duty of is-

suing permits to sell milk and its products and of inspection and general control is placed in the city board of health. The ordinance prescribes numerous rules and regulations to aid in carrying out this object, and makes their violation a misdemeanor and a ground for revoking permit or license.

The appellant's misdeed, as set forth in the complaint, consisted of doing what is forbidden and punished by section 9 of said ordinance, reading as follows:

"It shall be unlawful for any person to offer for sale milk, cream, condensed milk, evaporated milk, butter milk or skimmed milk to which any chemical or foreign substance has been added for the purpose of adulterating, modifying or preserving the same, such as, formaldehyde or its preparations, boric acid, salicylic acid, benzoate of soda, or any other preparation containing these or substances of like nature."

That is, he had offered for sale milk containing boric acid. From a conviction in the police court of the city of Yuma he appealed to the superior court of Yuma county, where, upon a trial *de novo,* he was again convicted.

This appeal is prosecuted under section 1156 of the Penal Code of 1913, the appellant questioning the validity of section 9 of said Ordinance No. 70. He contends that the corporation was without power to pass said section 9, and we suppose, although he does not so state, that his objection goes to the whole ordinance, for it is obvious that if the rest of Ordinance No. 70 is valid section 9 thereof must also be.

The general powers of a municipal corporation are very well stated by Mr. Chief Justice WAITE in *Ottawa* v. *Carey,* 108 U. S. 110, 27 L. Ed. 669, 2 Sup. Ct. Rep. 361, as follows:

"Municipal corporations are created to aid the state government in the regulation and administration of local affairs. They have only such powers

of government as are expressly granted them, or such as are necessary to carry into effect those that are granted. No powers can be implied except such as are essential to the objects and purposes of the corporation as created and established. 1 Dill. on Mun. Corp., § 89 (3d ed.) and cases there cited. To the extent of their authority they can bind the people and the property subject to their regulation and governmental control by what they do, but beyond their corporate powers their acts are of no effect."

The rule is stated by Dillon as follows:

"It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied." 1 Dillon on Municipal Corporations, 5th ed. 237.

The town of Yuma was incorporated under chapter 9, title 11, Revised Statutes of 1901, and as incorporated possessed the powers therein granted, as well as any others conferred by the legislature, directly or indirectly, upon towns of its class. Ordinance No. 70 was passed by the town council in 1908. The powers conferred upon the common councils of the towns incorporated under chapter 9 are set out in paragraph 545 thereof, and it is in subsection 28 of said paragraph that the respondent claims is set forth the authority to pass Ordinance No. 70. That subsection reads as follows:

"To do all other acts, and prescribe all other regulations, which may be necessary or expedient for the prevention or suppression of disease."

The two preceding subsections (26 and 27) give specific authority to the corporation to adopt preventative measures against the introduction therein of contagious, loathsome or infectious diseases, as, by quarantining, by requiring owners and occupants to keep premises clean, and by prohibiting certain enumerated businesses, such as distilleries, slaughterhouses, tanneries, soap factories, etc., from being carried on within the town or within two miles thereof.

Appellant would also have us limit the powers conferred under subsection 28 to the making of quarantine regulations for the purpose of preventing or suppressing disease. It is certainly capable of such construction; but why it should be thus limited is not easy to see, since previous provisions fully cover that particular subject. We would rather think the sweeping grant of power in subsection 28 was given to the legislative body of the town so that it might adopt other regulations than those enumerated in subsections 26 and 27 to prevent and suppress diseases, or, putting it conversely, for the purpose of protecting the health, comfort and welfare of the public.

It seems to have been a common practice for legislatures, in providing what powers municipal corporations should be allowed to exercise to enumerate specifically most of such powers, concluding, however, with what the courts have called "a general welfare clause," the evident purpose of which was to supply the corporation, in the event such power may have been overlooked in specific grants, power of self-protection or self-defense. The form of such welfare clause is usually much broader than subsection 28, and instead of being a grant of power "to do all other acts, etc., for the prevention or suppression of disease," the grant is in some such words as these: "To make all regulations which may be necessary or expedient for the preservation of the public

health." Whichever wording is adopted, the purpose is the same and must necessarily be accomplished by the same means. If disease is prevented or suppressed, it is to preserve the health of the people. In *Johnson* v. *Simonton,* 43 Cal. 242, under the general welfare clause, the legislative body of the city of San Francisco passed an ordinance forbidding any person from selling in the city milk of any cow fed upon still slops. It was objected that such body was without authority to pass the ordinance. The court said:

"If it indeed be a fact that the milk of cows, fed in whole or in part upon still slops, is unwholesome as human food, there can be no doubt of either the authority or the duty of the board to enact the ordinance in question. . . . "

Under a general welfare clause worded "to do all acts, make all regulations which may be necessary or expedient for the promotion of health or the suppression of disease," an ordinance regulating, and in case of minors prohibiting, the sale of cigarettes was held to be within the powers granted to the city of Chicago. *Gundling* v. *City of Chicago*, 176 Ill. 340, 48 L. R. A. 230, 52 N. E. 44. In that case the court used this language:

"The regulation of the police power is hardly susceptible of exact definition, as the exigencies of each case are varying, and the cases are innumerable where the health of the inhabitants of the municipality may be in some degree endangered. When the city council considers some occupation or thing dangerous to the health of the community, and in the exercise of its discretion passes an ordinance to prevent such a danger, it is the policy of the law to favor such legislation as being humane and essential to the preservation and protection of the community. Municipalities are allowed a greater degree of liberty or legislation in this direction than any other. The necessity for action is often more urgent, and the consequences of neglect are more detrimental to the

public good, in this than in any other form of local evil.''

In the case of *City of St. Louis* v. *Schoenbusch*, 95 Mo. 618, 8 S. W. 791, quoted in *Ex parte Simmons*, 5 Okl. Cr. 399, 115 Pac. 380, the court said:

"These cases serve to show that general welfare clauses are not useless appendages to the charter powers of municipal corporations. They are designed to confer other powers than those especially named. The difficulty in making specific enumeration of all such powers as may be properly delegated to municipal corporations renders it necessary to confer such powers in general terms. Ordinances relating to the comfort, health, good order, convenience, and general welfare of the inhabitants are regarded as the exercise of police regulations. 1 Dillon on Municipal Corporations, 3d ed., § 141.''

See, also, 28 Cyc. 795; *Ex parte Johnson* (Okl. Cr. App.), 201 Pac. 533.

That the preservation of the public health is a matter of public and governmental concern was recognized by the legislature of the territory of Arizona, when, in 1903 (chapter 65, Laws of 1903), there was enacted a law providing for state, county and city boards of health. This law was carried forward in the revision of 1913 as title 41. Paragraph 4383 of the Civil Code (title 41) provides that the boards of health of cities shall consist of the mayor, the city engineer, and a practicing physician "and shall have and exercise the powers conferred upon such board by law and by the ordinances of such city.'' This law creating city boards of health was a part of the charter of every incorporated town and city in Arizona, Yuma among the others. That an ordinance may derive its validity from several different grants of power and not depend solely upon a single section or clause of a statute, we think, is well settled. *Gundling* v. *City of Chicago, supra.*

As heretofore stated, Ordinance No. 70 conferred
the power of general supervision of the enforcement
of its provisions upon a city board of health. The
statute creating a city board of health (title 41, Civ.
Code 1913) prescribes and defines some of the duties
of such body, and leaves it with the city authorities
to prescribe other duties for it to perform in con-
nection with the preservation of the public health.
It would be a vain thing to provide by law for a mu-
nicipal board of health and not empower the corpora-
tion to take necessary steps to aid it to preserve and
protect the public health. Taking subsection 28,
*supra,* and the law creating boards of health, and
construing them together, we think impliedly, if not
directly, the legislative body of the town of Yuma
had power to license and regulate the sale of milk
and its products within its limits, and to forbid its
adulteration, and to punish those violating ordinances
enacted for that purpose.

In 18 A. L. R., at page 236, in a note to *Cofman*
v. *Ousterhous,* 40 N. D. 390, 168 N. W. 826, the writer
rather caustically criticises the extent to which the
courts have gone to sustain regulations in the sale
and disposition of milk and its products, and then
says:

"But the fact is that there is scarcely an exception
to the rule that the courts will sustain, as a police
measure, practically every regulation which is said by
the health board to be necessary to the protection of
milk as food. Therefore, the decisions uphold not
only the regulations for the licensing of dealers, the
inspection of cattle, the surroundings in which they
are kept, the cleansing of utensils, and provisions
against adulteration, but they sustain also the tuber-
culin test for cattle, and a blood test for peddlers,
and have even sustained a regulation requiring
dealers to give bond to pay for milk purchased."

In this note the cases are collated, and fully sus-
tain the writer's conclusion.

In *St. Louis* v. *Schuler*, 190 Mo. 524, 1 L. R. A. (N. S.) 928, 89 S. W. 621, an ordinance forbidding the use of any preservative in milk to be sold within the city was upheld as a valid evercise of the police power. In that case the defendant was charged with using formaldehyde for the purpose of preserving the milk. In *Isenhour* v. *State*, 157 Ind. 517, 87 Am. St. Rep. 228, 62 N. E. 40, a conviction under a statute forbidding one having in possession milk containing formaldehyde was sustained. And in *State* v. *Schlenker*, 112 Iowa, 642, 84 Am. St. Rep. 360, 51 L. R. A. 347, 84 N. W. 698, a conviction for mixing boracic acid with milk was sustained.

The last two cases were prosecutions under statutes, and of course do not involve the exercise of the police power of a municipality, but only go to the point that the police power of the state is rightfully exercised to prevent the adulteration of milk by the use of such preservatives. In the Schuler case, the conviction was for a violation of a city ordinance. In that case it was said:

"It is a matter of common knowledge that milk is a necessary food of the sick and of the infirm, of the old and the young; that through the agency of impure milk the germs of many diseases are disseminated, and even where there is an absence of any deleterious impurity or the germs of specific diseases adulterated or diluted milk is not wholesome and nutritious. . . . It cannot be said that the effect of formaldehyde in milk is so well known not to be. deleterious that the courts must take judicial cognizance of that fact. That its action is such that it changes the chemical properties of the milk so that it will not sour was established and conceded on the trial, and it was for this reason that it was insisted that, as it preserved the milk from souring, it was claimed to be highly beneficial. We cannot accept this conclusion. It must be recognized that it was a legislative function, in the passage of this ordinance for the preservation of health, to insist that milk should

have neither adulterants nor preservatives placed in it, and to inquire as to the effect thereof."

In 1914 the town of Yuma adopted a freeholders' charter. It exercised this right under the provisions of section 2 of article 13 of the Constitution, and chapter 16 of title 7 of the Civil Code. It is provided therein that upon the approval of the proposed charter by the Governor of the state it "shall become the organic law of such city and supersede any charter then existing [and all amendments thereto], and all ordinances inconsistent with said new charter." Ordinance No. 70 of the town of Yuma is not an ordinance of the city of Yuma, except it be by adoption. In article 16 of the freeholders' charter there is this section:

"Sec. 5. All ordinances, resolutions and regulations of the city of Yuma in force at the time this charter takes effect, and not inconsistent with the provisions thereof, are hereby continued in force until the same shall be duly amended or repealed (*sic*)."

Ordinance No. 70 is not only not inconsistent with the provisions of the freeholders' charter, but the exercise of powers explicitly provided for therein, as will be seen on a reading of the following sections of the charter:

"Sec. 39. To provide for and regulate the inspection by the health officer of meats, poultry, fish, game, bread, butter, cheese, lard, eggs, vegetables, breadstuffs, milk and other food products offered for sale in the city, and to provide for the taking and summarily destroying of any such products as are unsound, spoiled, adulterated, or unwholesome, and to regulate and prevent the bringing into the city, or having or keeping within the city, any such unsound, spoiled, adulterated or unwholesome products.

"Sec. 40. To provide for the regulation and inspection of all dairies, slaughterhouses and creameries that offer for sale any of their products to the city."

A freehold charter gives to a municipal corporation power to enact any and all rules, regulations, and ordinances "consistent with and subject to the Constitution and laws of the state." It may provide for the exercise of powers by the corporation not delegated to it by the legislature. It is not required to look to legislative authority before exercising a power, but to look to its "organic law," as its charter is called in the Constitution.

Looking to sections 39 and 40 as quoted above, the city of Yuma has plenary power to regulate, license, supervise, and control the production, sanitation and sale of milk and milk products, and to penalize those violating its ordinances enacted to accomplish that purpose. Ordinance No. 70 and section 9 thereof are entirely consistent with the present charter of the city of Yuma and were expressly "continued in force" by section 5 of article 16 of said charter.

The judgment of the lower court is affirmed.

McALISTER, C. J., and LYMAN, J., concur.